UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IVETTE WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>Defendant. | No. 17 C 1936<br><br>Magistrate Judge Mary M. Rowland |

# MEMORANDUM OPINION AND ORDER

Plaintiff Ivette Williams filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB, a claimant must establish that he or she is disabled within the meaning of the Act.[1] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standard for determining DIB is virtually identical to that used for SSI. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains

person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?

2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?

3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4. Is the claimant unable to perform his or her former occupation?

5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

2

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on January 18, 2013, alleging she became disabled on April 20, 2012. (R. at 13). These claims were denied initially and upon reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 13, 139–40). On August 11, 2015, Plaintiff, represented by counsel, testified at a hearing before Administrative Law Judge (ALJ) Jordan Garelick. (*Id.* at 13, 33–93). The ALJ also heard testimony from Dennis Gustafson, a vocational expert (VE). (*Id.*).

The ALJ denied Plaintiff's request for benefits on October 23, 2015. (R. at 13–22). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of April 20, 2012. (*Id.* at 15). At step two, the ALJ found that Plaintiff had the following severe impairments: history of autoimmune diseases (including hepatitis, lymphocytic thyroiditis, Sjogren's syndrome, and fibromyalgia), primary biliary cirrhosis with III/IV staging, and depression. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 16).

The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC)[2] and determined that Plaintiff has the RFC to perform restricted light work as defined in 20 C.F.R. § 404.1567(b), but with the following limitations:

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum

3

> The claimant can lift/carry or push/pull 20 lbs. occasionally and 10 lbs. frequently. In an 8-hour workday, she can stand/walk and sit 6 hours. She is unable to use ladders, but can frequently use stairs. She can frequently balance and stoop. She can occasionally kneel, crouch and crawl. Her manipulative ability is limited to occasional bilateral reaching, handling and fingering. She must avoid all unprotected heights and operation of a motor vehicle. She must avoid moderate exposure to extreme heat/cold, humidity, fumes, pulmonary irritants and vibration. The claimant is capable of performing simple routine work in a non-production rate environment. She will be off-task less than 10% of the day.

(R. at 17). The ALJ determined at step four that Plaintiff was unable to perform any past relevant work. (*Id.* at 20). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the local economy that Plaintiff can perform, including school bus monitor, rental clerk, or usher. (*Id.* at 21). Accordingly, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act, from the alleged onset date through the date of the ALJ's decision. (*Id.* at 22).

The Appeals Council denied Plaintiff's request for review on January 12, 2017. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security

---

that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v.*

*Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## V. DISCUSSION

Plaintiff contends that the ALJ's decision contains errors of law and is not supported by substantial evidence because the ALJ (1) failed to assign any weight to the opinions of her treating physicians; (2) failed to consider her irritable bowel syndrome (IBS) and narcolepsy to be severe impairments at step two; and (3) failed to consider Listing 11.02.

### A. The ALJ Did Not Properly Evaluate the Opinions of Plaintiff's Treating Physicians

The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion

6

of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

If a treating physician's opinion is not given controlling weight, an ALJ must still determine what value the assessment *does* merit. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Campbell*, 627 F.3d at 308. In making that determination, the regulations require the ALJ to consider a variety of factors, including: (1) the nature and duration of the examining relationship; (2) the length and extent of the treatment relationship; (3) the extent to which medical evidence supports the opinion; (4) the degree to which the opinion is consistent with the entire record; (5) the physician's specialization if applicable; and (6) other factors which validate or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)–(6).

Stated another way, the ALJ must first assess whether to give the treating physician's opinion controlling weight. If the ALJ does not give the opinion controlling weight under this first step, the ALJ cannot simply disregard it, but must proceed to the second step and determine what *specific* weight it should be given by using the checklist factors. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). "These steps are separate and distinct; ALJs are not permitted to conflate them." *Booth v. Colvin*, No. 14 CV 50347, 2016 WL 3476700, at *4 (N.D. Ill. June 27, 2016); *see also Edmonson v. Colvin*, No. 14 CV 50135, 2016 WL 946973, at *5 (N.D. Ill. Mar. 14, 2016) ("The ALJs routine conflation of these steps is maddening."). As explained below, the ALJ did not follow these two steps.

7

In August 2015, Roneil Malkani, M.D., Plaintiff's treating neurologist and sleep medicine specialist, submitted a statement indicating that Plaintiff was under his care for the treatment of hypersomnia and opined that the likely cause was narcolepsy. (R. at 2503). Dr. Malkani stated that Plaintiff's "excessive daytime sleepiness severely limits her daytime functioning to the point that she sleep[s] much of the day and no longer drives as she has fallen asleep twice while driving." (*Id.*). He further indicated that he had recommended starting medication for the hypersomnia. (*Id.*).

Richard Green, M.D., Plaintiff's treating hepatologist, also submitted a letter in August 2015, in which he opined that Plaintiff's symptoms of severe fatigue and abdominal pain were due to her underlying liver disease. (R. at 2777). He indicated that Plaintiff was undergoing maximum medical therapy and the only curative procedure would be a liver transplant, although her Model End State Liver Disease (MELD) score was not currently high enough. (*Id.*). Dr. Green further opined that Plaintiff's difficulty in mentation could be due, at least in part, to liver disease. (*Id.*). He anticipated that Plaintiff's liver disease would progress, even with maximum medical therapy, and indicated that she was at risk for developing additional symptoms and complications of end-stage liver disease. (*Id.*).

The following is the entirety of the ALJ's discussion of the opinions of Dr. Malkani and Dr. Green:

> Drs. Malkani and Green did not offer residual functional capacity assessments. Dr. Malkani indicated that the claimant was beginning treatment for hypersomnia. Dr. Green felt the claimant's liver disease could progress.

(R. at 20). This "discussion" is wholly inadequate. As an initial matter, "governing regulations do not require a treating physician to submit a function-by-function assessment of a patient as part of his opinion, and dismissing a treating physician's opinion for that reason is inappropriate." *Virden v. Colvin*, 2015 WL 5598810, at *9 (C.D. Ill. Sept. 22, 2015) (collecting cases). Furthermore, the ALJ failed to specify what weight he assigned to each physician's opinion, and he did not account for any of the factors listed in 20 C.F.R. § 404.1527. Specifically, the ALJ did not discuss the nature and extent of the treatment relationships, the frequency of examinations, the supportability of the opinion, the consistency of the opinion with the record as a whole, or whether the doctors had a relevant specialty. Indeed, "there is no evidence that the ALJ applied—or was even aware of—the checklist. There are no *explicit* references, or even indirect allusions, to the factors." *Edmonson,* 2016 WL 946973, at *7 (emphasis in original).

"The ALJ's decision cannot leave the weight given to the treating physician's testimony to mere inference: the decision must be sufficiently specific to make clear to any subsequent reviewers the weight the ALJ gave to the treating source's medical opinion and the reasons for that weight." *Ridinger v. Astrue*, 589 F. Supp. 2d 995, 1006 (N.D. Ill. 2008) (citing *David v. Barnhart*, 446 F.Supp.2d 860, 871 (N.D. Ill. 2006)). Multiple factors favor crediting the opinions of Drs. Malkani and Green, including their specialties, the nature and extent of the treatment relationships, and the frequency and types of examinations. "Proper consideration of these factors may have caused the ALJ to accord greater weight to [Plaintiff's

9

treating physicians'] opinions." *Campbell*, 627 F.3d at 308. The ALJ's failure to "sufficiently account [ ] for the factors in 20 C.F.R. SSS 404.1527," *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013), prevents this Court from assessing the reasonableness of the ALJ's decision.

In addition, the Court notes that the treatment records from these two physicians contain several other opinions regarding Plaintiff's overall condition, functional abilities, and limitations. Many of these notations by the doctors constitute treating source medical opinions, which the ALJ was required to address and evaluate. *See* 20 C.F.R. § 404.1527(a)(2) ("Medical opinions . . . reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restriction."). "Assigning weight to medical statements is a fundamental duty of an ALJ." *Cole v. Astrue*, No. 09 C 2895, 2011 WL 3468822, at *7 (N.D. Ill. Aug. 8, 2011). Here, the ALJ's failure to properly evaluate these opinions warrants remand.

In sum, remand is required because the ALJ failed to articulate what weight he assigned the opinions of two of Plaintiff's treating physicians. *See Reyes v. Colvin*, No. 14 C 7359, 2015 WL 6164953, at *11 (N.D. Ill. Oct. 20, 2015) ("[T]he ALJ must assign weight to each opinion and minimally articulate his reasons for so weighting.") (internal quotations omitted); *see also Ammerman v. Berryhill*, No. 3:15 C 542, 2017 WL 1149283, at *4 (N.D. Ind. Mar. 27, 2017) ("[T]he ALJ failed to ascribe a weight to Dr. Posner's opinion . . . As a result, the ALJ must be given

another opportunity to determine whether Posner's opinion is entitled to controlling weight and, if not, explain why.").

On remand, the ALJ shall reevaluate the weight to be afforded to the opinions of Drs. Green and Malkani. If the ALJ finds "good reasons" for not giving the opinions controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give the opinion.

**B. The ALJ Failed to Properly Consider All of Plaintiff's Impairments at Step Two**

Plaintiff additionally argues that the ALJ erred at step two by making no finding regarding her narcolepsy. The Court agrees. At step two, the ALJ must determine whether the claimant has any medically determinable impairments based on objective medical evidence. 42 U.S.C. § 423(d)(1)(A). Here, the ALJ made no finding as to whether Plaintiff's diagnosis of hypersomnia is severe or non-severe despite the existence of medical evidence supporting the diagnosis in the record. As a result, the Court also has no way to assess whether her symptoms, in combination with other limitations, are disabling. "Even if there were *insufficient* evidence to support the existence of *any* [sleep-related disorder], the ALJ should have so stated. This is what the regulations require." *Olson v. Colvin*, 2014 WL 4792117, at \*5 (W.D. Wis. Sept. 24, 2014) (emphasis in original).

Moreover, even on a cursory review, there is evidence that Plaintiff had symptoms consistent with hypersomnia and/or narcolepsy during the relevant time period. Most significantly, a multiple sleep latency test (MSLT)[3] performed in April 2014 revealed an abnormal mean sleep latency of 4.8 minutes, indicating excessive daytime sleepiness. (R. at 2756). The official diagnosis was hypersomnia. (*Id.*). Further, Plaintiff's sleep medicine specialist, Dr. Malkani, noted on multiple occasions that she was treating Plaintiff for hypersomnia and believed narcolepsy was the likely cause. (*See, e.g.*, R. at 2403, 2503, 2580, 2583, 2606, 2632).

The Commissioner concedes that the ALJ did not explicitly consider Plaintiff's narcolepsy within his severity discussion, but contends that this omission was harmless as the ALJ "evaluated evidence related to her narcolepsy and associated sleep issues later in his decision." [Dkt. 15, at 3]. This argument is not persuasive. First, the "evaluation" of the evidence the Commissioner points to is, at best, a brief summary of some of the medical evidence. It is well-settled that "summarizing medical evidence is no substitute for actual analysis of medical evidence." *Erwin v. Astrue*, No. 11 CV 1555, 2012 WL 3779036, at *8 (N.D. Ill. Aug. 30, 2012). And, while the ALJ need not discuss every piece of evidence in the record, he "must build

---

[3] "The multiple sleep latency test is the general test used as part of the diagnosis of narcolepsy. The study is conducted during the daytime and measures how long it takes a person to fall asleep, the patient's sleep latency. Sleep latency is measured in four or five separate twenty-minute napping phases throughout the day, and that sleep is measured for signs of REM sleep, which indicates narcolepsy. The more quickly the patient falls asleep, the more severe the symptoms of narcolepsy. Any result below five minutes shows the potential for serious sleep problems, and the average narcoleptic patient has a sleep latency of about three minutes." *Curtis v. Astrue*, 2008 WL 4822548, at *1 (S.D. Ind. Nov. 3, 2008) (*citing* Donna Arand, Ph.D, Michael Bonnet, Ph.D, Thomas Hurwitz, M.D, Merrill Mitler, Ph.D, Roger Rosa, Ph.D and R. Bart Sangal, M.D, *The Clinical Use of the MSLT and MWT*, 28 Sleep 123 (2005)).

an accurate and logical bridge from the evidence to [his] conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). The ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir. 1995), but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto,* 374 F.3d at 474; *see also Scrogham v. Colvin*, 765 F. 3d 685, 697 (7th Cir 2014) (the ALJ must consider the entire record, including those portions of the record that do not support the ALJ's ultimate determination). The ALJ failed to consider the medical records documenting Plaintiff's treatment for hypersomnia and Plaintiff's testimony that it impacts her health and ability to work. By failing to address the evidence supportive of a disability finding, the Court cannot determine whether the ALJ considered this evidence in making his determination.

Put simply, while there is *some* mention of Plaintiff's hypersomnia in the ALJ's opinion, there is no express finding that Plaintiff's condition was characterized as severe or non-severe for purposes of step two of the evaluation process. This deficiency is amplified by the fact that the ALJ took the time to describe other conditions as severe/non-severe. (R. at 15–17). Remand is generally warranted where the ALJ fails to consider evidence of an impairment at step two because the scope and severity of the impairments evaluated at step two can impact the ALJ's equivalence determination at step three and his RFC determination. *See Ridinger*, 589 F. Supp. 2d at 1005. "Indeed, since no finding is made with respect to ["Plaintiff's hypersomnia] at all, a remand is necessitated." *Olson*, 2014 WL

4792117, at *5; *see also Staley v. Colvin*, 2016 WL 7447734, at *3 (S.D. Ind. Dec. 28, 2016) ("The ALJ failed to address the evidence of record supporting the possibility of MCTD as a severe impairment. The Commissioner cannot rely upon harmless error to cure this potentially far-reaching defect. Thus, remand is appropriate to correct the error.").

**C. Other Issues**

Because the Court is remanding to reevaluate the weight to be given to the opinions of Plaintiff's treating physicians and for further consideration of Plaintiff's hypersomnia, the Court chooses not to address Plaintiff's other arguments. However, on remand, after determining the weight to be given the treating physician's opinion, the ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 at 817 (citation omitted). Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [11] is **GRANTED**. Defendant's Motion for Summary Judgment [14] is **DENIED**.

Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this Opinion.

Dated: January 2, 2018    E N T E R:

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　MARY M. ROWLAND
　　　　　　　　　　　　　　　　United States Magistrate Judge